# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

SIDNEY M.,

        Plaintiff,

vs.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

        Defendant.

No.  C21-2034-LTS

**MEMORANDUM
OPINION AND ORDER**

_____

      Plaintiff Sidney M. (the Claimant) seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for disability income (DI) benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq. (the Act) and supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq.[1]  The Claimant contends the administrative record (AR) does not contain substantial evidence to support the Commissioner's decision that he was not disabled during the relevant period.  For the reasons that follow, the Commissioner's decision is affirmed.

## I.    BACKGROUND

      The Claimant was born in 1993.  AR 58.  He completed high school and has previously worked as a painter, construction laborer and prep cook, although none of these jobs lasted long enough to constitute past relevant work.  *Id.* at 60, 466.  He filed his applications for DI and SSI on February 23, 2018, alleging a disability onset date of

---

[1] In accordance with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, I will refer to a Social Security claimant by the claimant's first name and last initial due to significant privacy concerns.

June 1, 2017, which he later amended to March 11, 2016. *Id.* at 331, 370. He alleged disability due to bipolar disorder, depression and anxiety. *Id.* at 388.

The Claimant's claims were denied initially and on reconsideration. *Id.* at 83-142. He then requested a hearing before an Administrative Law Judge (ALJ). ALJ Michael Lee Larner conducted an in-person hearing on September 23, 2019. *Id.* at 53-82. The Claimant, his father and a vocational expert (VE) testified. The ALJ issued a decision on October 7, 2019. *Id.* at 146-61. He determined there were jobs available in significant numbers in the national economy that the Claimant could perform such as hand packager, janitor and order picker. *Id.* at 160-61.

The Claimant sought review by the Appeals Council. *Id.* at 256-57. The Council granted review and remanded to the ALJ with instructions to:

- Consider the testimony and third-party statements of the Claimant's mother and father

- Analyze whether the Claimant's impairments met the "paragraph C criteria" for listing 12.04

- Determine the Claimant's date last insured for DI benefits

- Obtain evidence from a medical expert regarding whether the Claimant's mental impairments met a listed impairment

- Evaluate the Claimant's mental impairments in accordance with 20 C.F.R. § 404.1520a and 416.920a

- Give further consideration to the Claimant's maximum residual functional capacity and provide appropriate rationale with specific reference to evidence of record

- If warranted, obtain supplemental evidence from a VE

*Id.* at 168-70.

The ALJ conducted a telephonic hearing on September 23, 2020. *Id.* at 30-52. The Claimant, his father and a VE testified. The ALJ obtained answers to a medical

2

interrogatory from Suniti Barna, Ph.D., a state agency psychological consultant, who opined that the Claimant met listing 12.04. *Id.* at 777-83. The ALJ issued a decision on November 5, 2020, concluding that the Claimant's impairments did not meet a listed impairment, summarizing the Claimant's father's testimony and determining that the date last insured was September 30, 2016. *Id.* at 11-23. The ALJ found there were jobs that existed in significant numbers that the Claimant could perform including janitor, packager and laundry worker and thus, he was not disabled. *Id.* at 22.

The Claimant again sought review by the Appeals Council, which denied review on May 4, 2021. *Id.* at 1-5. The ALJ's decision thus became the final decision of the Commissioner. *Id.*; 20 C.F.R. § 404.981. On June 15, 2021, the Claimant filed a complaint in this court seeking review of the Commissioner's decision. The parties have submitted a stipulation of facts (Doc. 14) and briefed the issues. *See* Docs. 15, 16, 17. They have also filed supplemental briefs to address the separate issue of whether the ALJ's appointment violated the Appointments Clause. *See* Docs. 23, 24, 25. The matter is fully submitted.

## II. *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. An individual has a disability when, due to his physical or mental impairments, he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). If the claimant is able to do work which exists in the national economy but is unemployed because of inability to get work, lack of opportunities in the local area, economic conditions, employer hiring practices or

3

other factors, the ALJ will still find the claimant not disabled. 20 C.F.R. § 404.1566(c)(1)-(8).

To determine whether a claimant has a disability within the meaning of the Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Id.* § 404.1520; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial" work activity involves physical or mental activities. "Gainful" activity is work done for pay or profit. 20 C.F.R. § 404.1572(a).

Second, if the claimant is not engaged in substantial gainful activity, then the Commissioner looks to the severity of the claimant's physical and medical impairments. If the impairments are not severe, then the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not severe if "it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a); *see also* 20 C.F.R. § 404.1520(c); *Kirby*, 500 F.3d at 707.

The ability to do basic work activities is defined as having "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; (2) capacities for seeing, hearing and speaking; (3) understanding, carrying out and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* § 404.1521(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).

Third, if the claimant has a severe impairment, then the Commissioner will determine its medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled regardless of age, education and work experience. 20 C.F.R. §§

404.1520(a)(4)(iii), 404.1520(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) and the demands of his past relevant work. If the claimant cannot do his past relevant work then he is considered disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4). Past relevant work is any work the claimant has done within the past 15 years of his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. *Id.* § 404.1560(b)(1). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *See* 20 C.F.R. § 404.1545(a)(1). The RFC is based on all relevant medical and other evidence. *Id.* § 404.145(a)(3). The claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Id.* If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education and work experience. *Id.* §§ 404.1512(f), 404.1520(a)(4)(v). The Commissioner must show not only that the claimant's RFC will allow him to make the adjustment to other work, but also that other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can make the adjustment, then the Commissioner will find the claimant is not disabled. *Id.* At step five, the Commissioner has the responsibility of developing the claimant's complete medical history before making a determination about the existence

5

of a disability. *Id.* § 404.145(a)(3). The burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

If after these five steps the ALJ has determined the claimant is disabled but there is medical evidence of substance use disorders, the ALJ must decide if that substance use is a contributing factor material to the determination of disability. 42 U.S.C. § 423(d)(2)(C). The ALJ must then evaluate the extent of the claimant's limitations without the substance use. *Id.* If the limitations would not be disabling, then the disorder is a contributing factor material to determining disability and the claimant is not disabled. 20 C.F.R. § 404.1535.

### III. THE ALJ'S FINDINGS

The ALJ made the following findings:

1. The Claimant meets the insured status requirements of the Social Security Act through September 30, 2016.

2. The Claimant has not engaged in substantial gainful activity since March 11, 2016, the amended alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3. The Claimant has the following severe impairments variably diagnosed as major depressive disorder; bipolar disorder; mood disorder, NOS; and history of polysubstance abuse (20 CFR 404.1520(c) and 416.920(c)).

4. The Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds the Claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to simple, routine tasks with the ability to have occasional interaction with co-workers and

6

supervisors. However, he can have no work-related interaction with the public and he can adapt to no more than simple changes in a work setting.

6.     The Claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.     The Claimant was born on June 28, 1993, and was 22 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The Claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not an issue because the Claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.    Considering the Claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the Claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

AR 13-22.


## IV.     THE SUBSTANTIAL EVIDENCE STANDARD

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without

being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

8

# V. DISCUSSION

The Claimant argues the ALJ made the following errors:

1.    Not following the Appeals Council's remand order by (1) failing to consider whether his impairments met a listing, (2) his treatment of Barna's medical expert opinion and (3) his evaluation of parent testimony and reports

2.    Not articulating sufficient reasons for finding Mr. Ekstrom's opinions unpersuasive

3.    Not articulating sufficient reasons for finding Dr. Barna's opinions unpersuasive

4.    Not fully and fairly developing the record concerning "some medical evidence" support for the RFC

*See* Doc. 15.  The Claimant also argues the ALJ lacked a proper appointment under the Federal Vacancies Reform Act (FVRA) and the Appointments Clause of the United States Constitution and that his claim should be remanded to be decided by a new ALJ who was properly appointed.  Doc. 23.  I will address each of these arguments separately below.

## A.    Compliance with the Appeals Council's Remand Order

Upon remand, the Appeals Council instructed the ALJ to:

- Determine the Claimant's date last insured for Title II disability insurance benefits

- Obtain evidence from a medical expert related to whether the Claimant's mental impairments meet or equal the severity of an impairment listed in Appendix 1, Subpart P, Regulations No. 4 (20 CFR 404.1513a(b)(2) and 416.913a(b)(2)).

- Give consideration to the nonmedical source statements of the Claimant's mother and father as provided through hearing testimony and Exhibit 8E.

- Further evaluate the Claimant's mental impairments in accordance with

9

the special technique described in 20 CFR 404.1520a and 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c) and 416.920a(c), as well as adequate rationale regarding the "C" criteria findings for Listing 12.04.

- Give further consideration to the Claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and 416.945 and Social Security Rulings 85-16 and 96-8p).

- If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the Claimant's occupational base (Social Security Ruling 85-15). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

- If the Claimant is found disabled, conduct the further proceedings required to determine whether drug addiction and alcoholism are contributing factors material to the finding of disability.

AR 169-70.

On remand, the ALJ obtained a medical expert opinion from Suniti Barna, Ph.D., who found that the Claimant met Listing 12.04 based on the "paragraph B" and the "paragraph C" criteria. AR 779. Dr. Barna opined substance abuse exacerbated the Claimant's symptoms but found substance abuse was "secondary to his primary mental health impairment." *Id.* at 781. The Claimant argues the ALJ did not comply with the Appeals Council order because he found the first prong of the "paragraph C" criteria was

met but that the second was not due to "no evidence of marginal adjustment, such that the claimant would have minimal capacity to adapt to changes in the environment or to demands that are not already part of daily life." AR 15. The ALJ reasoned that the Claimant was able to live with others, cook simple meals, do laundry and, before COVID, went to the gym every other day with his brother. *Id.* He also attended a pro football game and took a vacation to Alabama in 2019. *Id.* He had done "odds and ends" jobs and gone fishing as well. *Id.*

The Claimant argues this finding was error because the Appeals Council was aware that he regularly went to the gym and still wanted the ALJ to evaluate whether his impairment met or equaled a listing. He argues the pro football game and family vacation were passive activities arranged by his father and not valid reasons to reject the medical expert's opinions. He explains that he lived with his father and could not be left alone for long. Finally, he contends that if the ALJ found that the medical opinion testimony was insufficient on the issue of whether the Claimant met a listing, the ALJ was obligated to further develop the record by sending follow-up interrogatories or having Dr. Barna testify at a hearing.

In his initial decision, the ALJ stated: "The undersigned has also considered whether the 'paragraph C' criteria are satisfied. In this case, the evidence fails to establish the presence of the 'paragraph C' criteria." AR 149. In his decision following remand, he analyzed the "paragraph C" criteria as follows:

> The undersigned has also considered whether the 'paragraph C' criteria are satisfied. In this case, the evidence fails to establish the presence of the 'paragraph C' criteria. To meet the paragraph C criteria, there must be ongoing medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s). The treatment must be with a frequency consistent with accepted medical practice for the type of treatment or evaluation required. The record does not indicate, with the exception of hospitalizations and an [sic] stent at a residential care facility, that the claimant has received mental health treatment on even a monthly basis. (Overall record.) He has not received medical treatment for his mental health problems on even a monthly basis for the last two years.

11

However, even assuming this prong was met, the second prong of the paragraph C criteria was not.

There is no evidence of marginal adjustment, such that the claimant would have minimal capacity to adapt to changes in the environment or to demands that are not already part of daily life. The claimant is able to live with others, cook simple meals, do laundry, and, before COVID, went to the gym every other day with his brother. (Exh. 7E.) He went to a pro football game and on vacation to Alabama in 2019. (Exh. 23F, p. 3.) The claimant has done odds and ends jobs, and gone out fishing. (Exh. 23F, p. 5.) In addition, a number of recent mental status health exams were essentially normal (See, e.g., Exh. 23F, p. 1 (August 2019); Exh. 23F, pp. 3-4 (December 2019); Exh. 23F, p. 5 (April 2020).) While the claimant has had hallucinations in the past, he had said that they had stopped approximately a year before his June 2018 consultative exam; the claimant attributed them stopping to medications, though the consultative examiner noted that this was also approximately the time he had stopped using substances (Exh. 9F, p. 4.) At one point, the claimant himself linked his auditory hallucinations to heavy methamphetamine use. (Exh. 4F, p. 2.) The claimant's inpatient hospitalizations do not indicate that the claimant has only minimal capacity to adapt to changes in the environment or to demands that are not already part of daily life.

While the claimant has had inpatient hospitalizations, he has not been committed since his last stay in late 2017 (followed by a month-long stay in a residential care facility). Even in that hospital stay, it was noted that that [sic] the providers did not notice bizarre or dangerous behavior or suspected hallucinations. (Exh. 4F, p. 6.) The most significant concerns of the provider for that stay appeared to be a flattened affect and borderline grooming. As noted above, the claimant has normally presented on exams with adequate grooming. The other two inpatient hospitalization stays were in October 2016 and December 2017. He had tested positive for methamphetamine in the latter and urine sample, though requested, was not provided in the former. The claimant did say in October 2016 that his mood swings and acting erratically were mostly related to his drug use. (Exh. 2F, p. 15.) Overall, the record simply just does not support a finding of marginal adjustment.

AR 15-16.

The Social Security regulations state that an ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. §§ 404.977(b), 416.1477. The Claimant's argument is better characterized as a criticism of the ALJ's analysis because the ALJ clearly performed an analysis of the "paragraph C" criteria as instructed by the Appeals Council. The relevant question therefore, is whether the ALJ's decision on this issue is supported by substantial evidence in the record as a whole.

On that issue, the Claimant raises two points: the ALJ's rejection of Dr. Barna's opinion without any further development of the record and the weight given to activities such as the Claimant's attendance at a football game and going on a family vacation. Dr. Barna's opinion was presented in the form of a medical interrogatory. *See* AR 777-82. Dr. Barna opined that the Claimant's impairments met Listing 12.04. With regard to the "paragraph C" criteria, Dr. Barna found that both prongs were met and cited unemployment, difficulty living independently, frequent hospitalizations and unhealthy coping (with substances) in support as well as Exhibits 1F-7F, 9F, 12F, 13F, 17F and 19F-24F. *Id.* at 780.

> The ALJ addressed this opinion as follows:
>
> In October 2020, Sunniti Barna, Ph.D., a state agency psychological consultant, opined that the claimant met listing 12.04. (Exh. 27F.) The consultant noted that had [sic] medical treatment that was ongoing and he had marginal adjustment. These findings are unpersuasive, being inconsistent with the claimant's ability to go gym [sic] regularly, go to a pro football game, and his overall presentation on exams combined with the relative effectiveness of his treatment while compliant with medications.

*Id.* at 21. Based on the ALJ's reasons, it appears he primarily took issue with Dr. Barna's findings concerning marginal adjustment. The regulations provide:

> The criterion in C2 is satisfied when the evidence shows that, despite your diminished symptoms and signs, you have achieved only marginal adjustment. 'Marginal adjustment' means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already

13

part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

The ALJ was not required to obtain additional medical opinion evidence from Dr. Barna under the circumstances. The Appeals Council required only that the ALJ obtain medical evidence from an expert regarding whether the Claimant's impairments met a Listing. The ALJ did that. The Claimant argues that if the ALJ felt that Dr. Barna's opinion was deficient, he should have sent follow-up interrogatories or offered a supplemental hearing. I agree that, in the event the ALJ felt Dr. Barna did not answer the questions posed or that his answers were ambiguous, he would have had to follow up, but that is not what happened here. The ALJ concluded Dr. Barna's opinion was not supported by the record as a whole. There was no confusion or ambiguity with regard to Dr. Barna's opinion that needed to be resolved. Rather, there was a disagreement based on the record. The ALJ was not required to develop the record any further in this situation. *See McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011) (ALJ's duty to develop the record "is not never-ending and an ALJ is not required to disprove every possible impairment").

The ALJ's reasons for finding lack of marginal adjustment are primarily based on the Claimant's daily activities, his outings to a pro football game and family vacation in Alabama and medical evidence that his symptoms are being effectively controlled through medication. The Claimant argues that his daily activities, such as going to the gym, should not be considered because these activities were in the record (and the written

14

decision) when the Appeals Council remanded the case. I disagree. The Appeals Council remanded the case based on a lack of any analysis as to the paragraph C criteria – not on any particular evidence.

The Claimant argues these activities do not otherwise establish no marginal adjustment because the gym has now closed due to COVID. He states that he does not get out much now and that the other activities, which were arranged by his father, required the Claimant's attendance because he cannot be left alone without experiencing paranoia. As noted above, marginal adjustment means a person has minimal capacity to adapt to changes in his or her environment or demands that are not already a part of his or her daily life. The Claimant's statement that he does not get out much now does not show marginal adjustment because it is not related to an exacerbation of his symptoms from being out in public but to the gym being closed.

In addition, the reasons the Claimant attended a football game and went on the family vacation are not as relevant as his response to those situations, which involve changes to his daily life. Had the Claimant decompensated or experienced an exacerbation of symptoms during those events, this may have constituted evidence of marginal adjustment. But the record reflects that he had no issues during the football game and family vacation and that he adapted well after his gym closed due to COVID. AR 745 ("He did go to Green Bay Packers game with his father and enjoyed that"); *Id.* at 747 (during April 2020 appointment the Claimant reported he was feeling and doing fairly well and while the gym closing made him a little moody and irritable, he had bought some equipment to work out at home and that was helping him). The Claimant points to no other evidence in the record suggesting that changes in his routine led to exacerbation of symptoms or deterioration in his functioning. I find that ALJ's analysis of the "paragraph C" criteria complies with the Appeals Council remand order and is supported by substantial evidence in the record as a whole.

Next, the Claimant argues the ALJ failed to comply with the Appeals Council remand order by failing to address the third-party reports of his mother and father. The

15

Claimant's mother provided statements dated March 8, 2018, and August 8, 2018, which are largely identical. *See* AR 404-11; 433-40. She described him being off task, lacking focus, experiencing paranoia and having difficulty being around people. *Id.* The Claimant's father testified at both hearings. He described his son's paranoia, difficulties focusing and his day-to-day activities. *Id.* at 44-47; 71-78.

As noted above, the ALJ did not address evidence from either parent in his initial decision and the Appeals Council instructed him to give consideration to this evidence on remand. *See id.* at 169. It specifically noted:

> The claimant's father appeared and testified at the hearing on this matter conducted on September 23, 2019 (Hearing Audio, 2:30:09 PM). The claimant's mother submitted a detailed third party function report prior to the hearing (Exhibit 8E). The hearing decision does not identify the claimant's father as a witness or otherwise indicate that his testimony as a nonmedical source was considered. Likewise, the hearing decision does not mention or address the claimant's mother's nonmedical source statement in any way. The regulations require the Administrative Law Judge to consider all evidence, including statements from nonmedical sources. Consideration of this evidence may materially affect the Administrative Law Judge's evaluation of medical source statements and/or corroborate other evidence of record regarding the severity and effects of the claimant's mental impairments.

AR 168. In his decision following remand, the ALJ summarized the Claimant's father's testimony from both hearings. *Id.* at 17. He also cited the Claimant's mother's statement, noting the times in which it supported the Claimant's own allegations. *Id.* at 14-15.

The Claimant argues the ALJ failed to comply with the Appeals Council order because he did not address these statements in the opinion section as nonmedical source opinions. I find no error with this aspect of the ALJ's decision. The Appeals Council instructed that the ALJ must "give consideration to the nonmedical source statements of the claimant's mother and father as provided through hearing testimony and Exhibit 8E." *Id.* at 169. The ALJ demonstrated such consideration by discussing and citing to Exhibit 8E and the Claimant's father's testimony in the decision. The Appeals Council Order

did not require anything further.  Thus, I find the ALJ's decision complied with this aspect of the Appeals Council order as well.

## B.    Mr. Ekstrom's Opinions

Daniel Ekstrom, Psy.S., was the Claimant's counselor or psychologist before he retired.  He began seeing the Claimant in 2016.  AR 523-24.  On May 16, 2019, he completed a Mental Impairment Questionnaire.  *Id.* at 699-704.  He found that the Claimant was either seriously limited, unable to meet competitive standards or had no useful ability to function in mental abilities and aptitudes needed to do unskilled, semiskilled or skilled work.  *Id.* at 701-02.  He also found these limitations applied to particular types of job duties, with the exception of adhering to basic standards of neatness and cleanliness, which he found that the Claimant's mental abilities and aptitude were limited but satisfactory.  *Id.* at 702.  Ekstrom concluded the Claimant had marked functional limitation in the ability to understand, remember, or apply information; extreme limitation in the ability to interact with others; extreme limitation in the ability to concentrate, persist or maintain pace; and marked limitation in the ability to adapt or manage oneself.  *Id.*  He found that the Claimant's impairments would cause him to be absent from work more than four days per month and that he could be expected to be off task due to his symptoms 25 percent or more of the workday.  *Id.* at 703.

The ALJ summarized Ekstrom's opinions but concluded they were "too extreme given the claimant's presentation on exams, his apparent responsiveness to treatment while compliant with medication and not abusing substances, and the relatively infrequent treatment that the claimant has received."  AR 21.  The Claimant argues the ALJ did not articulate sufficient reasons for finding Ekstrom's opinion unpersuasive.  Specifically, he argues the ALJ did not discuss the supportability factor as required under 20 C.F.R. §§ 404.1520c(b)(2); 416.920c(b)(2).  He contends that the record, including Ekstrom's treatment notes, supports Ekstrom's opinion.

The Commissioner argues that while it would have been preferable for the ALJ to discuss the consistency and supportability factors separately, his finding that Ekstrom's opinion was too extreme given the Claimant's presentation on exams and apparent responsiveness to treatment when compliant with his medication addressed the supportability factor. The Commissioner adds that courts have found that opinions that "consist of nothing more than vague, conclusory statements – checked boxes, circled answers, and brief fill-in-the-blank responses" and "cite no medical evidence and provide little to no elaboration" have limited probative value. Doc. 16 at 13 (quoting *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir, 2018)). Finally, the Commissioner argues that the Claimant's citation of evidence that purportedly contradicts the ALJ's decision ignores the standard of review, which is whether substantial evidence supports the ALJ's decision. She contends this invitation to reweigh the evidence is inappropriate as the court must conduct limited and deferential review, viewing the record in the light most favorable to the ALJ's decision.

The Social Security Regulations provide that for claims filed on or after March 27, 2017, such as this one, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). Instead, the ALJ must evaluate medical opinions based on supportability, consistency, the source's relationship with the claimant, any specialization and other factors that tend to support or contradict a medical opinion. *Id*. The regulations identify supportability and consistency as the most important factors and specifically direct the ALJ to articulate how he or she considered the medical opinions based on these factors. *Id*. at §§ 404.1520c(b)(2), 416.920c(b)(2) ("we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision").

Supportability is defined as: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her

medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1). Consistency is defined as: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." The ALJ may, but is not required to, explain how he or she considered the remaining factors.

The ALJ's conclusion that Ekstrom's opinions were "too extreme" given other evidence in the record could arguably be a statement about supportability or consistency. While I agree with the Commissioner that it would have been preferable for the ALJ to make his reasoning a little more explicit, I find any error should be considered harmless. *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, [the claimant] must provide some indication that the ALJ would have decided differently if the error had not occurred."). The Claimant points out that Ekstrom provided explanations of his findings in his notes (as opposed to the Medical Questionnaire form provided). *See* Doc. 705-08. With regard to objective support, Ekstrom stated he performed the Wechsler Adult Intelligence Scale IV and explained how the MMPI-2 results supported his opinions. *Id.* at 707-08. The Claimant notes that he also cited the Claimant's work history and Ekstrom's observations during his interview as supportive of his opinions. *Id.* Finally, the Claimant cites various treatment notes from Ekstrom that he believes support Ekstrom's opinion. *See* Doc. 15 at 12. With regard to the consistency factor and the specific reasons cited by the ALJ, the Claimant states that Ekstrom's opinion was consistent with those of Dr. Barna, the reports of his mother, his father's testimony, records demonstrating long term and recurrent inpatient and intensive outpatient treatment, court-ordered psychiatric medication management and evidence that he required social worker assistance with things like filling his weekly medication boxes through February 28, 2019. *Id.* at 12-15.

19

While this evidence could have supported an alternative outcome, that is not the relevant question. *See Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("Evidence that both supports and detracts from the ALJ's decision should be considered, and an administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."). This evidence does not convince me that the ALJ would have decided differently had he properly evaluated the supportability factor. *See Byes*, 687 F.3d at 917. I have reviewed the record to determine whether the ALJ's reasons for finding Ekstrom's opinions too extreme are supported by substantial evidence in the record as a whole. Those reasons all focused on the nature of the Claimant's treatment – including his presentation on exams, his responsiveness to treatment when compliant with medication and the infrequency of treatment.

I disagree with the ALJ that the record supports "relatively infrequent" treatment and find this reason is not supported by substantial evidence. The Claimant has been under court-ordered psychiatric treatment since his alleged onset date. The treatment notes demonstrate that his providers required him to follow up anywhere from four weeks to four months and the record reflects that the Claimant attended his court-ordered appointments as scheduled by the providers. However, the ALJ's other reasons for finding Ekstrom's opinions "too extreme" are supported by substantial evidence. The record shows that the Claimant presented at exams in fairly stable moods when he was compliant with medication and avoiding drugs, with the exception of some sleep difficulties and occasional anxiety or depression, which were met with adjustments in his medication. Indeed, at one point, Ekstrom suggested that the Claimant no longer required psychotherapy services. AR 520-21.

While it is possible to draw two inconsistent positions from the evidence concerning supportability and consistency as it relates to Ekstrom's opinions, one of those positions represents the ALJ's findings. As such, I must affirm this aspect of the ALJ's decision. *See Goff*, 421 F.3d at 789.

20

*C.*     *Dr. Barna's Opinion*

The Claimant argues the ALJ failed to address the supportability factor as to Dr. Barna's opinion and contends Dr. Barna's opinion is consistent with the record as a whole. As noted above, the ALJ discounted Dr. Barna's opinion that the Claimant met Listing 12.04 because it was inconsistent with the Claimant's overall presentation on exams, the relative effectiveness of his treatment when he was compliant with his medications and his ability to go to the gym regularly and to a professional football game. AR 21. The Commissioner acknowledges that the ALJ did not separately address the supportability of Dr. Barna's opinion as he should have, but argues this was harmless error because Dr. Barna never treated or examined the Claimant.

As discussed above, the ALJ is required to explain how he considered the supportability and consistency factors for a medical source opinion. 20 C.F.R. § 404.1520c(b)(2); 20 C.F.R. § 416.920c(b)(2). Dr. Barna cited various exhibits in the record in support of the opinion. AR 779-80. With regard to the "paragraph C" criteria, Dr. Barna mentioned unemployment, difficulty living independently, frequent hospitalizations and unhealthy coping (with substances) as evidence in support of the opinion. However, Dr. Barna did not cite page numbers as requested by the medical interrogatory. *Id.*

I agree with the Commissioner that the ALJ's failure to discuss the supportability of Dr. Barna's opinion was harmless. The ALJ's reasons are more than cursory and can be distinguished from the cases cited by the Claimant. In *Lucus v. Saul*, 960 F.3d 1066, 1069 (8th Cir. 2020), the ALJ found a treating physician's opinion was internally inconsistent but provided no further explanation. The ALJ also found the opinion that the claimant would get "nervous in crowds and unfamiliar places" conflicted with the doctor's treatment notes and the record as a whole, but again, offered no further explanation. *Lucas*, 960 F.3d at 1069; *see also Phillips v. Saul*, CASE NO. 1:19-CV-34-BD, 2020 WL 3451519, at *2-*3 (E.D. Ark. June 24, 2020) (ALJ's reasons that

21

medical opinion provided no supporting explanation and was inconsistent with the evidence from other medical and non-medical sources were insufficient).

Here, the ALJ found Dr. Barna's opinion was unpersuasive because it was "inconsistent with the claimant's ability to go [to the] gym regularly, go to a pro football game, and his overall presentation on exams combined with the relative effectiveness of his treatment while compliant with medications." AR 21. The ALJ cited the same reasons in other parts of his decision as evidence that the Claimant was not as limited as alleged. In those sections, he cited exhibits with page numbers and provided examples. *Id.* at 19-20. These reasons are supported by substantial evidence in the record as a whole. Any error in the ALJ's failure to specifically discuss the supportability factor is harmless as I cannot find that a proper evaluation of the factor would change the ALJ's decision.

### D.   *Some Medical Evidence in Support of RFC*

The Claimant argues that in the event I find the ALJ properly discounted the opinions of Ekstrom and Dr. Barna, the ALJ should have further developed the record to obtain sufficient medical support for the RFC determination. He contends the Appeals Council order made it clear that additional medical opinion evidence was needed and that the ALJ (1) should have obtained additional evidence if he found Dr. Barna's opinion was insufficient (2) should have sought opinion evidence beyond whether the Claimant met Listing 12.04. The Commissioner argues the ALJ fully and fairly developed the record and that there is no requirement for the ALJ to support the RFC determination with a specific medical opinion. The only requirement is that it be supported by at least "some medical evidence." *See Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)).

The ALJ's RFC determination is supported by some medical evidence. The record consists of multiple treatment notes describing how the Claimant was doing on his medications and any areas he was struggling with. As explained above, the notes indicate

that when compliant with his medications and not abusing drugs, his symptoms were well-controlled, except for some sleep issues. While he had multiple involuntary commitments and hospitalizations, these were during times when he was non-compliant with his medications and/or using methamphetamine. The Claimant reports he has not used methamphetamine since early 2018 and his last hospitalization was in January 2018 for substance abuse and mental health issues and at a time when the Claimant had been non-compliant with medication. AR 571-79.

The ALJ reviewed the record as a whole and determined that while the Claimant did have limitations in several areas, the medical evidence did not support the severity of limitations as described by the Claimant and some of the medical opinion providers. In other words, the ALJ disagreed with the medical opinion providers that the medical evidence (and other evidence in the record) supported more restrictive limitations. The ALJ was not required to come up with a specific medical opinion to support the RFC he ultimately adopted. *See Cox*, 495 F.3d at 619-20 ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."). The ALJ's RFC determination is supported by substantial evidence and did not require development of further medical opinion evidence.

E. **The ALJ's Appointment Under the FVRA and Appointments Clause**

The Claimant argues that Nancy A. Berryhill was not properly serving as the Acting Commissioner of the Social Security Administration (SSA) in July 2018 and, therefore, her ratification of SSA ALJs on July 16, 2018, was ineffective. *See Brian T.D. v. Kijakazi*, Case No. 19-cv-2542 (DTS), 2022 WL 179540 (D. Minn. Jan. 20, 2022), *appeal docketed* No. 22-1601 (8th Cir. Mar. 22, 2022) and *Richard J.M. v. Kijakazi*, No. 19-cv-827, 2022 WL 959914 (D. Minn. Mar. 30, 2022), *appeal filed sub nom. Messer v. Kijakazi*, No. 22-2127 (8th Cir. May 27, 2022). In the event I find Berryhill was properly serving as the Acting Commissioner, the Claimant argues she was

an inferior officer and lacked the authority to appoint ALJs under the Appointments Clause.

The Claimant's argument that Berryhill was not properly serving as the Acting Commissioner is fourfold. He argues: (1) SSA staff improperly appointed ALJ Larner, (2) the FVRA bars ratification of such an appointment (3) President Trump never directed Berryhill to serve and (4) Berryhill exceeded the limit on acting service under the FVRA. I will consider these issues before determining whether Berryhill's service violated the Appointments Clause. In addition, and as a threshold matter, I must address the Commissioner's argument that the Claimant has waived these arguments by failing to raise them in his opening brief.

### 1.     *Waiver*

The Claimant first raised issues concerning ALJ Larner's appointment in his reply brief, in which he requested leave to submit supplemental briefing. *See* Doc. 17 at 2. Chief Magistrate Judge Mahoney granted leave (Doc. 20) and the parties submitted supplemental briefs on this issue. *See* Docs. 23, 24 and 25. The Commissioner argues there is no reason why the Claimant could not have raised these points earlier as the case he primarily relies on – *Brian T.D. v. Kijakazi* – was briefed in February 2020 and supplemented in summer and fall of 2021 by the same counsel representing the Claimant. Other judges in this district have declined to allow supplemental briefing on these issues because plaintiffs failed to explain why the arguments could not have been raised at the outset of the litigation. *See Steere v. Kijakazi*, No. 20-cv-2077, Doc. 24 at 4-5 (N.D. Iowa Apr. 5, 2022); *Mulcahy v. Kijakazi*, No. 6:20-cv-2086, Doc. 23 (N.D. Iowa Apr. 5, 2022); *Zoch v. Kijakazi*, 5:20-cv-4058, Doc. 21 (N.D. Iowa Apr. 5, 2022).

The Claimant argues he has not waived the arguments because (1) a plaintiff may raise a claim of this nature at an even later stage of the proceedings in a motion under Federal Rule of Civil Procedure 60 and (2) Congress designed Social Security proceedings to be "unusually protective of" claimants." Doc. 23 at 4 (quoting *Smith v.*

24

*Berryhill*, 139 S. Ct. 1765, 1770 (2019)).  In the alternative, the Claimant argues that I should exercise discretionary review authority pursuant to *Freytag v. Comm'r*, 501 U.S. 868, 878-79 (1991).

Issues raised for the first time in a reply are typically considered waived.  *See Mahaney v. Warren Cnty.*, 206 F.3d 770, 771 n.2 (8th Cir. 2000) ("Claims not raised in an initial brief are waived, and we generally do not consider issues raised for the first time . . . in a reply brief.").  However, this issue broadly addresses a situation that is likely to appear in other cases as well.  Because the parties have thoroughly briefed the issue, I will consider it on the merits.  *See Barham v. Reliance Standard Life Ins. Co.*, 441 F.3d 581, 584 (8th Cir. 2006) (recognizing that while the court generally does not consider arguments raised for the first time in a reply brief, it is not precluded from doing so).

### 2.    *Berryhill's Service as Acting Commissioner Under the FVRA*

The parties agree that ALJ Larner was appointed sometime between 2016 and 2017 by lower level SSA staff rather than by the head of the agency.  *See Carr v. Saul*, 141 S. Ct. 1352, 1357 (2021) (recognizing that SSA ALJs had been selected by lower-level staff rather than appointed by the head of the agency prior to July 16, 2018).  They dispute, however, whether Acting Commissioner Berryhill was permitted to ratify the appointment, which she purported to do on July 16, 2018.  The Claimant argues Berryhill's ratification had no effect because (1) the FVRA bars ratification of an improper action (2) President Trump did not direct Berryhill to serve as Acting Commissioner and (3) her service as Acting Commissioner exceeded the FVRA time limits.  The Claimant's argument is grounded in the Appointments Clause, which provides that for inferior officers (such as ALJs), Congress may vest their appointment in the President, courts, or department heads.  *See* U.S. Const., art. II, § 2, cl. 2 ("Congress may by law vest the Appointment of such inferior Officers, as they think

proper, in the President alone, in the Courts of Law, or in the Heads of Department.").[2] The issues are (1) whether Berryhill was a valid department head and (2) whether she could ratify ALJ Larner's appointment.

The Claimant argues that regardless of Berryhill's status as a valid Acting Commissioner, she could not ratify the actions of SSA staff in appointing ALJ Larner under § 3348(d) of the FVRA:

> (1) An action taken by any person who is not acting under section 3345, 3346, or 3347, or as provided by subsection (b), in the performance of any function or duty of a vacant office to which this section and sections 3346, 3347, 3349, 3349a, 3349b, and 3349c apply shall have no force or effect.
>
> (2) An action that has no force or effect under paragraph (1) may not be ratified.

5 U.S.C. § 3348(d). The Claimant argues because SSA staff, rather than a validly appointed officer, appointed ALJ Larner, that action had no force or effect and, as such, cannot be ratified. Judge Mahoney considered this issue in *Bauer v. Kijakazi*, focusing on whether SSA staff was performing a "function or duty" by appointing ALJs. She reasoned:

> "Function or duty" for purposes of § 3348 (containing the antiratification provision) is defined as a function or duty that is required by *statute* or *regulation* to be performed by the vacant officer position. Here, no statute or regulation required that the Commissioner of Social Security appoint ALJs; rather, the Supreme Court held in June 2018 that the Constitution required that the Commissioner of Social Security appoint ALJs. When Social Security staff hired the ALJ here, they were not purporting to act as the agency head; rather, at that time, the Social Security Administration did not believe that ALJs were inferior officers subject to the Appointments Clause. If a statute or regulation had made it clear at the time of the ALJ's hiring that ALJs must be appointed by an agency head, Colvin or Berryhill likely would have appointed the ALJ here.

---

[2] *See* 5 U.S.C. § 3105 ("Each agency shall appoint as many administrative law judges as are necessary for proceedings required to be conducted in accordance with sections 556 and 557 of this title.").

*Bauer v. Kijakazi*, Case No. 21-CV-2008-KEM, 2022 WL 2918917, at *9 (N.D. Iowa July 25, 2022). I agree with Judge Mahoney that SSA staff was not performing a "function or duty" of the vacant office of the Commissioner when it appointed ALJs prior to *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2055 (2018). As such, I do not find that ratification of the ALJs' appointments was barred under § 3348 based on the initial appointment by lower-level staff.

With regard to whether Berryhill was a valid department head who could ratify those appointments, the Claimant argues that (1) she was not directed to serve by President Trump and (2) she exceeded the time limits under § 3346. On January 20, 2017, former Acting Commissioner Carolyn Colvin resigned in conjunction with the inauguration of President Trump. Berryhill took office as Acting Commissioner on January 21, 2017, pursuant to a Presidential Memorandum issued by President Obama providing an order of succession for SSA officials to serve as Acting Commissioner under the FVRA. *See* Presidential Memorandum Providing an Order of Succession Within the Social Security Administration, 81 Fed. Reg. 96337 (Dec. 23, 2016).

The Claimant argues President Trump did not direct Berryhill to fill the vacant office pursuant to § 3345(a)(3), which provides "the President (and only the President) may direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity, subject to the time limitations of section 3346." The Claimant relies on the definition of "direct" as "to request or enjoin . . . with authority." Doc. 25 at 12 (quoting *Direct,* Merriam-Webster.com, https://bit.ly/3GiORUv). He argues the Commissioner cannot infer appointment from inaction and there is no evidence of any action by President Trump to direct Berryhill to fill the vacant office.

I agree with *Bauer* and *Brian T.D.* that because President Trump took no action to alter the line of succession, revoke the Succession Memo and select another Acting Commissioner or replace Berryhill during her service, he chose to follow the Succession

27

Memo and therefore "directed" Berryhill's service. *See Brian T.D.*, 2022 WL 179540, at *10. As Judge Mahoney noted, presidential directives are comparable to executive orders, which remain in effect through different presidencies until replaced, modified, revoked or lapse by their terms. *Bauer*, 2022 WL 2918917, at *2 (citing Benjamin Wilheim, Cong. Rsch. Serv., IF11358, Presidential Directives: An Introduction (2019), available at https://crsreports.congress.gov/product/pdf/IF/IF11358; and *Indigenous Env't Network v. Trump*, 428 F. Supp. 3d 296, 301 (D. Mont. 2019) (noting that an executive order from 2004 remained in effect until revoked by executive order issued in 2019)). It is undisputed that President Trump took no action with respect to the Succession Memo. As such, President Trump "directed" Berryhill's service as Acting Commissioner.

With regard to the time limits for Berryhill's service, the Claimant argues that the FVRA places a 210-day limit on acting service, which had expired by July 2018 when Berryhill ratified the appointment of all Social Security ALJs. The FVRA provides for a 90-day grace period following presidential transitions. 5 U.S.C. § 3349(a). The 210-day period expired on November 16, 2017. During this time, President Trump did not nominate a Commissioner of the Social Security Administration. On March 6, 2018, the Government Accountability Officer (GAO) announced that Berryhill's continued service as Acting Commissioner after November 17, 2017, violated the FVRA. On April 17, 2018, President Trump nominated Andrew Saul to be Commissioner. The SSA believed this revived Berryhill's acting service and she resumed her position as Acting Commissioner. On July 16, 2018, Berryhill ratified all ALJ appointments and kept running the SSA until June 4, 2019, when the Senate confirmed Saul.

The FVRA provides:

(a)    Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office –

(1)  for no longer than 210 days beginning on the date the vacancy occurs; or

(2)  subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

5 U.S.C. § 3346(a). The issue is whether subsection (2) is a tolling provision or a "spring-back" provision. The parties agree this is an issue of statutory interpretation.

With regard to the plain meaning of the statute, the parties have two points of disagreement concerning the phrases "the person serving as an acting officer" and "or." The Claimant argues that "the person serving as an acting officer" means that only the person presently serving in an acting capacity may serve during the pendency of a nomination. The Commissioner argues this merely establishes a time limit for an individual serving as an acting officer under the FVRA in contrast to an individual who may be serving as an acting officer under an office-specific vacancy statute. She contends that limiting § 3346(a) to only a presently-serving acting officer would create a conflict with § 3345, which allows the President to designate an acting official after a first assistant assumes the role by default. *See* 5 U.S.C. § 3345(a)(1)-(3). If § 3346(a) is limited only to a presently serving acting officer, the President would be barred from designating anyone else under § 3345 or in the event of death or resignation of the presently serving acting officer.

With regard to "the person serving as an acting officer as described under section 3345," the *Brian T.D.* and *Richard J.M.* courts relied on the word "serving" to reason that § 3346 applies to the person currently serving and not to a person who had previously served as Acting Commissioner. According to this interpretation, Berryhill was the "person serving as an acting officer" from January 21, 2017, through November 16, 2017, when her term expired under § 3346(a)(1). When Saul was nominated to become Commissioner on April 17, 2018, Berryhill was no longer serving as Acting

29

Commissioner, so § 3346(a)(2) could not apply to further service by Berryhill. *See Brian T.D.*, 2022 WL 179540, at *11.

Judge Mahoney disagreed with this analysis, noting that the active verb of § 3346(a) is "may serve" and that the *Brian T.D.* and *Richard J.M.* interpretation would not make sense as to subsection (a)(1):

> Subsection (a) refers to "the person serving as an acting officer as described under section 3345." Thus, "serving" is used to refer back to section 3345, which sets out who may serve as acting officer (first assistants or certain other people directed by the President). While § 3345 provides who may serve as an acting officer, § 3346 sets the periods of time during which such persons may serve in that role. Significantly, the active verb in § 3346(a) is not serving but "may serve": "the person . . . may serve" subject to the time limits set out in subsections (a)(1) and (a)(2). By using "may serve," Congress did not convey that the person had to be currently serving for the nomination rule in subsection (a)(2) to apply ("the person . . . may serve . . . once a . . . nomination . . . is submitted . . . from the date of such nomination for the period that the nomination is pending."). Indeed, "serving" is used in subsection (a) generally (not (a)(2) specifically), and the District of Minnesota's reasoning would apply with equal force to subsection (a)(1). If the use of "serving" in subsection (a) means the person must be currently serving at the time of the nomination ("the person serving . . . from the date of such nomination"), it also means the person must be currently serving at the time of the vacancy ("the person serving . . . on the date the vacancy occurs"). This makes no sense.

*Bauer*, 2022 WL 2918917, at *7. I agree with Judge Mahoney that reference to "the person serving as acting officer" refers to who may serve generally under § 3345 and that there is no requirement that the person be currently serving to serve under subsection (a)(2). The phrase "the person serving as an acting officer" applies equally to subsection (a)(1) and it would be nonsensical for the statute to allow a person to serve on "the date the vacancy occurs" while also requiring that person to be presently serving as an acting officer. There cannot be a vacancy and a "person serving as an acting officer" at the same time.

The other dispute between the parties concerns the impact of the word "or" between subsection (a)(1) and (a)(2). The Commissioner argues that "or" is inclusive, meaning acting service is permitted during either or both of the two periods: (1) 210 days after the vacancy or (2) during the pendency of a first of second nomination. The Claimant's interpretation, consistent with *Brian T.D.* and *Richard J.M.*, is that the person presently serving as an acting officer may serve during the 210-day period and also during the pendency of a nomination, but only if the nomination was submitted during the 210-day period. In *Brian T.D.*, the court reasoned that "or" served to suspend the time limitation, not to create an entirely separate and distinct period of service. *Brian T.D.*, 2022 WL 179540, at *13. The court explained that the use of "or" provided for an alternative length of service rather than creating a series of non-contiguous periods of service. *Id.* If Congress had intended to create three distinct periods of service, it would have used "and." *Id.*

> Again, Judge Mahoney disagreed, stating:

> Congress did not qualify the use of "or" with "either," which tends to indicate that the alternatives are mutually exclusive. In addition, if subsections (a)(1) and (a)(2) were mutually exclusive, a person could serve for the initial 120 days, or they could serve during the pendency of a nomination, but not both. But no court disputes that a person can serve both for the initial 210 days and while a nomination is pending; rather, *Brian T.D.* and *Richard J.M.* held that a person can serve during the pendency of a nomination under subsection (a)(2) only if they were currently serving the initial 210-day term under subsection (a)(1). This reads language into the statute that does not exist (even when "or" is construed as an exclusive disjunctive).

*Bauer*, 2022 WL 2918917, at *7. Aside from the plain language, Judge Mahoney also relied on the legislative history, noting that the Senate committee report from July 1998 makes clear that an "acting officer may serve even if the nomination is submitted after the [210] days has passed although . . . the acting officer may not serve between the [210th] day and the day the nomination is submitted." *Id.* at *8 (quoting S. Rep. No. 105-250, at 14 (1998)). She noted the language of the proposed § 3346(a) is the same as

31

the language that was ultimately adopted, except for changing the time period from 150 days to 210 days. *Id.*

There is a dispute as to the significance of § 3348 in interpreting § 3346. In *Brian T.D.*, the court reasoned that the Commissioner's interpretation would contradict § 3348, which states: "Unless an officer or employee *is performing* the functions and duties in accordance with sections 3345, 3346, and 3347 . . . *the office shall remain vacant.*" 5 U.S.C. § 3348(b)(1) (emphasis added). The court reasoned that "[s]omeone cannot avoid § 3348's directive that the 'office shall remain vacant' by invoking § 3346 as authority to serve as acting officer because § 3348 requires that person to already be performing duties according to §§ 3345, 3346, and 3347." *Brian T.D.*, 2022 WL 179540, at *14. The legislative history of § 3348 reflects that the proposed language was "if the President does not submit a first nomination to the Senate to fill a vacant office within 150 days after the date on which a vacancy occurs[,] . . . the office shall remain vacant until the President submits a first nomination to the Senate." S. Rep. No. 105-250, at 27 (1998). However, the language ultimately adopted states: "[u]nless an officer or employee is performing the functions and duties in accordance with sections 3345, 3346, and 3347 . . . the office shall remain vacant." 5 U.S.C. § 3348(b). The Congressional Record explains:

> Changes were made to § 3348(b) to provide that the vacant office provisions of the legislation apply not only when an acting officer has served more than 210 days without a nomination for the office having been submitted to the Senate, but also prior to the 210 days after the vacancy occurs unless an office of [sic] employee performs the functions of the vacant office in accordance with [the FVRA].

144 Cong. Rec. 27,497 (1998). The Commissioner argues that because Berryhill was performing the duties of the office in an acting capacity after Saul's nomination, consistent with § 3346(a)(2) (as well as § 3345(a)), § 3348(b)(1) did not require the office to "remain vacant." I agree with the Commissioner, and with Judge Mahoney's analysis on this issue, based on the reference to § 3346 and the absence of any language suggesting

32

that after the 210 days, the office was to "remain vacant" until the nomination was confirmed.

I find that § 3346(a)(2) may operate as a spring-back provision and, as such, Berryhill's acting service complied with the FVRA during the pendency of Saul's nomination. *See e.g.*, *Lance M. v. Kijakazi*, Civil Action No. 2:21-cv-628, 2022 WL 3009122, at *10-14 (E.D. Va. July 13, 2022) (finding that § 3346 contains a spring-back provision); *Williams v. Kijakazi*, No. 1:21-CV-141-GCM, 2022 WL 2163008, at *3 (W.D.N.C. June 15, 2022) (same). Berryhill was properly serving as Acting Commissioner under the FVRA at the time she ratified ALJ Larner's appointment in July 2018.

### 3. *The FVRA and the Appointments Clause*

The Claimant argues that if I find Berryhill's service was consistent with the FVRA, this interpretation would violate the Appointments Clause because (1) it does not allow inferior officers (like Berryhill) to appoint other inferior officers and (2) it does not allow inferior officers to serve as acting heads beyond a limited time and under special and temporary circumstances, which were not present here.

The Claimant argues that an inferior officer may serve only as an acting department head so long as the officer remains a "mere subordinate individual." *United States v. Eaton*, 169 U.S. 331, 344 (1898). *See also United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1988 (2021) ("the exercise of executive power by inferior officers must at some level be subject to the direction and supervision of an officer nominated by the President and confirmed by the Senate."). Because there was no oversight by an officer appointed by the President and confirmed by the Senate (referred to as a principal or PAS officer), the Claimant argues Berryhill had no authority to appoint or ratify the appointments of ALJs because this was a nondelegable function of a PAS position. Also relying on *Eaton*, the Claimant argues that Berryhill's service of 542 days as Acting Commissioner or otherwise leading the SSA, was not for a "limited time" and was not

33

under "special and temporary conditions" as Berryhill merely stepped into a vacancy that occurred under normal circumstances. *Compare Eaton*, 169 U.S. at 331-34 (involving 310 days of acting service under circumstances in which the consul general faced a grave illness, there was a presidential grant of leave and imminent arrival of an appointed replacement and the State Department supervised the acting official).

The Commissioner argues "longstanding Supreme Court precedent as well as centuries of unbroken historical practice" recognize that an individual who temporarily performs the functions of a PAS office in an acting capacity need not be appointed with Senate confirmation. Doc. 24 at 31 (quoting *United States v. Smith*, 962 F.3d 755, 763 (4th Cir. 2020)). She notes that *Arthrex* did not address the permissibility of acting service and *Eaton* also did not turn on the level of supervision over the Vice Consul's acting service. The Commissioner contends the Claimant's position that a non-PAS officer can never constitutionally serve as an acting department head conflicts with numerous cases and vacancies statutes. *See id.* at 33. She reasons that because (1) Congress may vest the appointment of inferior officers in the "Heads of Departments" under the Appointments Clause, (2) the Commissioner of SSA is a head of a Department[3] and (3) an "acting officer is vested with the same authority that could be exercised by the officer for whom he acts," *In re Grand Jury Investigation*, 916 F.3d 1047, 1055 (D.C. Cir. 2019), Berryhill could ratify the appointments of ALJs. As for the length of her service, the Commissioner calculates that it lasted for 390 days at most, which is not substantially longer than the 310 days of acting service recognized in *Eaton*. The Commissioner argues that *Eaton* was based on temporary service rather than exigent circumstances and that courts have not limited acting service by non-PAS officials to exigent circumstances.

---

[3] *See Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 511 (2010) ("Because the [Securities and Exchange] Commission is a freestanding component of the Executive Brach, not subordinate to or contained within any other such component, it constitutes a "Departmen[t]" for the purposes of the Appointments Clause.").

Judge Mahoney addressed these same issues in *Bauer*.  *See Bauer*, 2022 WL 2918917, at *10-17.  With regard to the length of Berryhill's acting service, she discussed the Supreme Court's recent summary of statutes that authorize acting service.  *Id.* at *10-11 (quoting *NLRB v. SW. Gen., Inc.*, 137 S. Ct. 929, 935-36 (2017) (cleaned up)).  She then discussed *Eaton* and observed that historically, the Constitution has allowed statutes like the FVRA that authorize temporary acting service or positions that normally require Presidential appointment and confirmation by the Senate.  *Id.* at *11.  She observed that at the time of Berryhill's ratification on July 16, 2018, she had served 390 days (counting the undisputed initial 300 days and then during the pendency of Saul's nomination).  She rejected the Claimant's argument that *Eaton*'s reference to "special and temporary conditions" meant that an acting officer could be appointed only long enough to accomplish a single task to comply with the Appointments Clause.  *Id.* at *12.

Judge Mahoney likewise rejected the argument that the Appointments Clause authorizes acting service only under "special conditions."  *Id.* (citing *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328, 1335 (Fed. Cir. 2022)).  While *Eaton* involved an illness, the other statutes the claimant relied on authorized acting service when the principal officer was "absen[t] from the seat of government."  *Id.* (citing *Boyle v. United States*, 1857 WL 4155, at *3, *7 (Ct. Cl. Jan. 19, 1857)).  Additionally, Judge Mahoney cited another district court's observation that when the Supreme Court "has . . . reaffirmed *Eaton*, . . . it has described *Eaton*'s holding in durational terms."  *Id.* (quoting *Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 356 F. Supp. 3d 109, 147 (D.D.C. 2019)).

Finally, Judge Mahoney addressed Justice Thomas' concurrence in *NLRB v. SW General, Inc.*, in which he stated, in response to the dissent, that appointment to a principal office in an acting capacity under the FVRA could violate the Appointments Clause.  *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 945-46 (2017).  He particularly took issue with the length of acting service in that case, which was three years in an office limited by statute to a 4-year term.  *Id.* at 946 n.1.  Judge Mahoney noted that this

35

argument is non-precedential and observed that Berryhill's acting service was much shorter (a little more than a year in a position with a six-year term). *Bauer*, 2022 WL 2918917, at *13. In the absence of authority holding that a statute authorizing acting service was facially unconstitutional under the Appointments Clause, or that the length of acting service violated the Appointments Clause, Judge Mahoney declined to find Berryhill's service under the FVRA violated the Appointments Clause based on its length.

I agree with Judge Mahoney's analysis on this point. *Eaton* is the most-relevant authority and Berryhill's acting service, which I agree is appropriately numbered at 390 days, is within reason of the 310 days recognized in *Eaton* as "temporary," particularly because the office of the Commissioner is a six-year term. Berryhill's service as Acting Commissioner did not violate the Appointments Clause based on its length or the circumstances, in which she was filling a vacant office.

With regard to whether acting officers may appoint inferior officers, Judge Mahoney analyzed *Arthrex*, which is the same case the Claimant relies on for his argument. *See* Doc. 23 at 25-27. In *Arthrex*, the Court stated that "the exercise of executive power by inferior officers must at some level be subject to the direction and supervision of an officer nominated by the President and confirmed by the Senate." *Arthrex*, 141 S. Ct. at 1988. Judge Mahoney observed that *Arthrex* did not address the power of acting officers but held that patent judges appointed by the department head were principal officers rather than inferior officers because their decisions were insulated from review by the department head. *Id.* 1985. To remedy the Appointments Clause violation, the Supreme Court invalidated the statute that allowed those decisions to be insulated from review and remanded to the Acting Director to decide whether to rehear the petition, noting that this opportunity for review by a principal officer would comply with the Appointments Clause. *Id.* at 1987-88. After the remand and the Acting Director's denial of rehearing, the Federal Circuit rejected an argument that *Eaton* required a principal officer to issue the final agency decision, stating that "an inferior

officer may temporarily perform an absent PAS officer's duties without violating the Appointments Clause." *Arthrex, Inc.*, 35 F.4th at 1333.

Judge Mahoney noted the Supreme Court has never considered whether inferior officers may appoint other inferior officers (whether through acting service or otherwise). *Bauer*, 2022 WL 2918917, at *16. She discussed Supreme Court cases and other cases that analyzed related issues, such as whether military judges were principal or inferior officers, *see Weiss v. United States*, 510 U.S. 163, 191-92 (1994) (Souter, J., concurring), whether acting officers have less authority than Presidential appointments, *see NLRB v. Noel Canning*, 573 U.S. 513, 541 (2014), and whether the Acting Attorney General constituted the department head for Appointments Clause purposes. *See In re Grand Jury Investigation*, 916 F.3d at 1056. Judge Mahoney concluded:

> Here, Berryhill (and any acting officer under the FVRA, other than the first assistant) must be appointed by the President. And under the FVRA, Congress expressly vested Berryhill, as the President's appointee, to "perform the functions and duties of the office." As the court noted in *Northwest Immigrant Rights*, the Supreme Court has observed that acting officials may exercise all the powers of the office in which they are serving" when "expressly empowered" by statute "to 'perform the duties' of the office." The Commissioner's powers include the ability to appoint ALJs, inferior officers. And I see no reason why an Acting Commissioner should not be considered a "Head[] of Department" for purposes of the Appointments Clause, especially to the extent that first assistants meet this definition.
>
> The Appointments Clause authorizes acting service, which necessarily empowers acting officers to take action that would otherwise violate the Appointments Clause if not performed by a "Head[] of Department[]" (e.g., promulgating rules; issuing final agency decisions). I find no reason to distinguish between these actions and the appointment of inferior officers. Through her position as Acting Commissioner of the Social Security Administration, Berryhill served as a department head, and her ratification of the ALJ's appointment here did not violate the Appointments Clause.

*Bauer*, 2022 WL 2918917, at *17.

I agree. In *Arthrex*, the Supreme Court remanded the case to the Acting Director to decide whether to rehear Smith & Nephew's petition.[4] *Arthrex*, 141 S. Ct. at 1987. Following remand, Arthrex argued that only a PAS officer could issue final agency decisions that are not subject to review by any superior officer and thus, the Commissioner's exercise of the Acting Director's authority to decide rehearing petitions violated the Appointments Clause. *See Arthrex*, 35 F.4th at 1334. The Federal Circuit rejected this argument on three grounds: (1) it would require ignoring the Supreme Court's decision directing "a remand to the *Acting* Director for him to decide whether to rehear [the] petition, *see Arthrex*, 141 S. Ct. at 1987, (2) it would require holding the FVRA facially unconstitutional because it permits inferior officers to perform a PAS officer's duties in an acting capacity, and (3) would directly conflict "with *Eaton*'s clear holding that an inferior officer may temporarily exercise a PAS officer's powers in his absence." *Id.* Therefore, the court rejected the argument that only a PAS officer may issue final agency decisions in all circumstances.[5] *Id.* The Claimant's argument that appointment of ALJs is a duty that only a PAS officer may perform (or must oversee) fails for the same reasons.

The Claimant has presented well-reasoned arguments and raised an important constitutional issue. However, I find that Berryhill's acting service, whether considered generally or specifically with regard to the ratification of ALJ appointments, was permissible under the FVRA. I further find that this interpretation of the FVRA is not

---

[4] The office of the Director and Deputy Director were vacant. Those responsibilities fell to the Commissioner for Patents under an Agency Organization Order pursuant to which the Commissioner was tasked with performing the non-exclusive functions and duties of the Director. *Arthrex*, 35 F.4th at 1332.

[5] While the court in *Arthrex* determined that reviewing rehearing requests was a delegable duty of the Director, and thus, the FVRA did not apply, I agree with Judge Mahoney that this did not seem to factor into the court's ruling on the Appointments Clause issue. *See Arthrex*, 35 F.4th at 1335.

unconstitutional under the Appointments Clause. The Claimant's request to remand on this basis is denied.

## VI. CONCLUSION

After a thorough review of the entire record and in accordance with the standard of review I must follow, I conclude that the ALJ's determination that the Claimant was not disabled within the meaning of the Act is supported by substantial evidence in the record. Accordingly, the final decision of the Commissioner is **affirmed**. Judgment shall enter against the Claimant and in favor of the Commissioner.

**IT IS SO ORDERED.**

**DATED** this 26th day of September, 2022.

_____
Leonard T. Strand, Chief Judge